**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DAPHNE McKINNEY, | : |
| Plaintiff, | : |
| | : |
| v. | :        3:06-cv-2055 (WWE) |
| | : |
| DEPARTMENT OF TRANSPORTATION FOR | : |
| THE STATE OF CONNECTICUT, LISA | : |
| TILUM, MICHAEL SANDERS, DENNIS | : |
| JOLLY, KATHLEEN KARWICK and VICKI | : |
| ARPIN, in their individual capacities, | : |
| Defendants. | : |

**MEMORANDUM OF DECISION ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This action arises from plaintiff Daphne McKinney's claims that she was

terminated from her position with defendant State of Connecticut Department of

Transportation ("DOT") in violation of her rights under Title VII of the Civil Rights Act of

1964 ("Title VII"). Plaintiff also asserts claims under 42 U.S.C. §§ 1981 and 1983 and

claims for intentional infliction of emotional distress and negligence. Now pending

before the Court is defendants' Motion for Summary Judgment (Doc. #94), which for the

following reasons will be granted.

**BACKGROUND**

The parties have submitted briefs and supporting exhibits which reflect the

following factual background relevant to this ruling.

**I.      Plaintiff's History at DOT**

Plaintiff, an African American woman, was hired by defendant State of

Connecticut Department of Transportation in 1993 as a Connecticut Career Trainee. In

1

1995, she was promoted to be a Transportation Planner I.[1]  In 2003, as part of the settlement of a federal lawsuit based on the DOT's alleged-failure to promote plaintiff, plaintiff was promoted to the position of Transportation Planner II in the Marketing and Transportation Demand Management Section of the Transit and Ridesharing Unit of the Bureau of Public Transportation.  In that position, plaintiff's responsibilities included dealing with one of three brokerages in helping commuters use alternate forms of transportation.

McKinney did not receive any performance appraisals between 2000 and 2003, which time coincided with the previous lawsuit.  During that period, when she was supervised by Dennis Jolly, she did receive her annual raise.[2]  Other employees under Jolly's supervision also did not receive performance appraisals, and McKinney did not hear of other employees receiving service ratings.

McKinney received two "inferior" service ratings from Jolly in 2003 and 2004, with an overall rating of "good."  Plaintiff refused to sign the "inferior" service ratings; instead, she had a union representative sign the rating on her behalf.  McKinney claimed that the performance appraisals from Jolly did not compare with her performance appraisals

---

[1]  To many of defendants' factual assertions, plaintiff denies the statement without pointing to specific evidence opposing defendants' statement.  For example, plaintiff points to her deposition testimony which often consists of hearsay, or is conclusory or without foundation.  Additionally, plaintiff's denials often address a point not in defendants' statement.  In instances that plaintiff's denial is not supported by admissible evidence or is not addressed to defendants' assertion, the Court will disregard plaintiff's denial and accept defendants' assertion as true.  See Local R. Civ. P. 56(a).

[2]  The DOT has a policy of providing yearly performance appraisals, but the policy is not always followed in the Transit and Ridesharing Unit.  On average, the Unit provides an annual service rating approximately half of the time.

for the previous ten years from various supervisors.  During that time, she did not receive overall ratings, but her ratings varied within the "good" category between "excellent" and "satisfactory."  These appraisals were either reviewed or prepared by Jolly, except for the appraisals in 1998 and 1999.

On March 24, 2004, plaintiff filed an action in Connecticut state court against her supervisor Brian Chapman asserting claims of defamation of character, intentional infliction of emotional distress and negligent infliction of emotional address.  The court granted summary judgment, dismissing the action.

On January 12, 2006, three vacancies were posted for the position of Transportation Supervising Planner.  Performance appraisals were not required in order to apply, but it is unclear whether they were considered when submitted.  On March 27, 2006, plaintiff requested copies of her service ratings so that she could apply for these jobs.  In the end, although plaintiff considered herself qualified, she did not apply because, she testified, she overheard Jolly tell another employee, John Rabbett, that plaintiff had "no chance in hell" of getting one of the positions.  Rabbett does not recall this conversation.  Furthermore, Jolly showed plaintiff a job specification for a Transportation Specialist position and referred to it as plaintiff's "best shot."  The subsequent internal affirmative action investigation launched in response to plaintiff's complaints concluded that plaintiff was not qualified for any of the vacant positions.

Plaintiff alleges that Jolly placed James Stutz on her projects over her objection.  Michael Sanders, the Transit Administrator in plaintiff's office, gave Jolly a mandate to coordinate all "public information" projects, which necessitated the placement of staff on others' projects.  It was a practice for projects to be staffed with teams.  Stutz, as

3

Transportation Planner 2, was assigned the marketing aspects on various projects for which other staff had lead responsibility.  His assignment was meant to provide consistency and effectiveness for the office's communication methods.  Plaintiff testified that often attendees at meetings would address and ask questions of Stutz rather than herself.

Sanders met twice with plaintiff to discuss her concern regarding the assignment of Stutz on her projects.  Plaintiff believed that the assignment was an attempt to have Stutz take over her projects.  During one of the meetings, Sanders told plaintiff that she should discuss with him any problems because it would be easier to investigate unfair tasks if he knew more about them.  Plaintiff never informed Sanders of any coworkers having similarly problems.

Jolly testified that the office used Microsoft Outlook as a scheduling tool.  Plaintiff testified that Jolly did not always use it and that she did not check it every day.  She further stated that Jolly would notify staff by meetings either verbally or by email.  On February 23, 2005, McKinney complained to Jolly that he had scheduled a meeting without first notifying her of it.  She said that he or his secretary should have notified her before scheduling it.  A meeting acceptance was generated from plaintiff's computer, though she contends, without any supporting evidence, that someone else may have accepted it.

Plaintiff stated that she was left out of important meetings with upper level management as well as meetings at the Legislative Office Building.  As to the latter meetings, plaintiff was unsure as to how many times she was left out.  Plaintiff asserts these claims despite notices of meetings being posted at two locations within the unit.

4

McKinney testified that she believed that she was discriminated against based on her race because other white female employees were taken to conferences out of state or out of the country, while she was only asked to attend a conference in Hoboken, New Jersey.  Sanders stated that he chose employees for each trip based on project assignments.  For example, Sanders averred that Sandy Infantino went to Hawaii, Miami and Europe for conferences on bus rapid transit because she was the project liaison for bus rapid transit.  Sanders's notes indicate that plaintiff declined a trip to New York City for a meeting because Stutz had been assigned to attend the same meeting.  Plaintiff did not receive any discipline for refusing to attend the meeting. Further, plaintiff never requested approval to attend any conferences, including those related to her project.  She states that this was because the denial "was a foregone conclusion" because Sanders "took nothing but white females."

Sanders's personal notes indicate that on June 20, 2005, McKinney complained that her new office was not as large as her coworkers' and that if anyone should bump into her in her narrow doorway, she would file suit.

## II.  Plaintiff's Relationship with Celeste Martires

Celeste Martires was a License Applications Analyst in the Regulatory and Compliance Unit.  Martires and plaintiff had different direct supervisors, but were both ultimately overseen by Sanders.  On August 26, 2005, Ricardo Almeida emailed Sanders saying that McKinney and Martires were being disruptive in the conference room with, what he believed was, non-work-related activities.  Almeida also wrote that other people found McKinney and Martires to be disruptive despite the conference room doors being closed.

Dennis King, Manager of the Regulatory and Compliance Unit from 2003 to 2005, testified in a separate lawsuit that he had spoken to McKinney several times about excessive socializing between McKinney and Martires.  He also testified that he received little cooperation from McKinney.  Plaintiff's service ratings, however, do not bear this out.

On September 28, 2005, Lisa Tilum became Martires's supervisor.  In an email on November 8, Tilum told Sanders that Martires and plaintiff were taking breaks of twenty-five minutes.[3]  Tilum did not issue discipline for this.  Tilum's personal notes and testimony indicate that on December 20, plaintiff spent time at Martires's desk outside of normal break times when Martires was expected to work.  As a result of this, Tilum discussed his concern about McKinney with Jolly.  Sanders also discussed with Jolly his concern about the amount of time that McKinney spent with Martires.  He was aware of such interactions because of the location of his office.  Tilum also indicated to Sanders that Martires's and plaintiff's interactions made it difficult for Tilum to supervise Martires.

Until September 2005, Sanders testified, he was not aware of any issues with Tilum's conduct in the workplace.  On January 3, 2006, Tilum submitted her resignation from Martires's supervision, stating that she could not "deal with the insults, lack of cooperation, and outbursts ... that Ms. Martires has barraged me with since ... September 2005."  Effective January 20, Sanders became Martires's direct supervisor.

Sanders's personal notes indicate that an employee reported on February 3, 2006 that McKinney was typing on Martires's computer during the work day.  Similar

---

[3]     Tilum's email alludes to employees generally taking breaks in the conference room.

conduct was indicated in Sanders's notes on June 1 and June 22.  His notes also indicate that on February 15, Martires and plaintiff took two breaks in one morning.  On May 8, according to Sanders's notes, Martires and plaintiff spent an "inordinate amount of time together" during the workday.  According to Sanders's notes, on June 6, Stutz, who was at this time McKinney's supervisor, saw plaintiff typing on Martires's computer. Stutz told plaintiff that she should not be at Martires's computer assisting Martires without a business reason.  Jolly stated that Sanders told him to be cognizant of plaintiff's socializing.  Throughout this time, however, there was no indication of plaintiff's socializing in her service ratings.  Sanders stated that he omitted these reports to maintain peace in the workplace.

III.    **File Cabinet Incident**

On December 8, 2005, plaintiff accessed a drawer marked "personal" in Martires's locked file cabinet while Martires was out of the office.  The key that plaintiff used was on Martires's key ring that allegedly included Martires's personal keys.  At the time, Tilum was Martires's acting supervisor and Sanders was Tilum's supervisor. During Martires's absence, they had been trying to access certain files which they believed may have been in her locked file cabinet and were indeed in the locked cabinet.  The cabinet had a tag indicating that it was property of the DOT.  Although Martires labeled her cabinet as "personal," DOT personnel policy prohibited the use of state property for non-state business purposes.  Further pursuant to state policy, all cabinets were subject to be opened and inspected at any time.

Tilum asked plaintiff to leave the cabinet open so that she could access a drawer labeled "pending files."  McKinney closed the drawer labeled "personal" and pushed the

7

lock button.  Tilum told plaintiff that she would discuss the matter with Sanders.

Sanders then came to Martires's cubicle and requested that plaintiff leave the file

cabinet open.  Plaintiff refused Sanders's and Tilum's request for the keys to the

cabinet, claiming that the keys were Martires's personal keys.  Sanders and Tilum had

been trying to access the file cabinet for the prior two days, but were unable to do so.

Although Sanders and Tilum stated that they were unsuccessful in telephoning

Martires, McKinney claims, and there is evidence to support, that her phone number

was available to them.

Because of their inability to contact Martires, Sanders asked McKinney for

Martires's phone number.  Plaintiff refused, stating that if Martires had not given

Sanders her phone number, neither would plaintiff.  Plaintiff also refused to call Martires

at home, stating that she was on stress leave, even though plaintiff herself had called

Martires.  Kathleen Karwick, Principal Human Resources Specialist, agreed to provide a

written request for the key to the cabinet to plaintiff.

Following this event, on December 20, 2005, Sanders informed the staff of the

Unit that duplicate and new keys would be made so that supervisors would have access

to all equipment.  He made the request to avoid any further incident.

As a result of this incident, McKinney accused Tilum of falsely imprisoning her in

Martires's cubicle and screaming at her.  Plaintiff never made a complaint about the

incident because, she claims, DOT employees could not request a fact-finding

investigation.  Plaintiff received no discipline as a result of this incident.  She filed a

CHRO complaint on June 2, 2006 alleging discrimination related to this action.

McKinney made requests on February 17 and March 6, 2006 for copies of

8

records under the Freedom of Information Act related to the file cabinet incident.  In

response, DOT provided certain documents while objecting to the disclosure of other

documents based on state law.  A memorandum by Charles Urso, Deputy

Commissioner, memorialized the objection.  Plaintiff did not file an appeal of such

rejection, but testified that she believed that it was based on her race or as retaliation.

Plaintiff attributed the objections to "whoever is in charge of DOT at this time."

IV.    **Plaintiff's Relationship with Lisa Tilum**

On April 27, 2006, Stutz met with McKinney and discussed plaintiff's then-lawsuit

against the DOT and her personal relationships at the DOT.  Despite plaintiff's

assurances that Stutz should not be intimidated by plaintiff's 2001 lawsuit, Stutz stated

that he was in fact intimidated.  On May 2, plaintiff sent Stutz an email summarizing

Tilum's alleged-conduct of bullying, glaring and grinning at plaintiff in the office and

women's restroom.  Plaintiff testified that her office was not near Tilum's, but that Tilum

came near plaintiff's area to talk to other employees.  While there, plaintiff alleges,

Tilum would grin, stare, laugh or smirk at her "trying to intimidate [her]."

In response to the email, Stutz contacted Karwick for advice on addressing the

issues.  Karwick suggested that Stutz meet with plaintiff.  On May 4, Stutz asked Jolly

whether he was aware of any of the current allegations of bullying by Tilum against

plaintiff; Jolly was not.  At one time, during February or March 2006, plaintiff asked Jolly

if the described-conduct would constitute bullying.  Jolly told her that her perception, not

his impression, was important.  He directed her to contact her supervisor or Human

Resources.  Jolly recalls no further communication with plaintiff on the subject.  Jolly

told Karwick that he had the conversation with plaintiff and that plaintiff might file a

9

bullying complaint.  Jolly did not talk to Tilum because he did not think that plaintiff would have wanted him to.

After Stutz informed Sanders of plaintiff's complaints, Sanders decided to allow the complaint to be handled by Stutz as plaintiff's supervisor, in accordance with policy. Pursuant to Karwick's instruction, Stutz met with plaintiff on May 8, 2006 to find out more about plaintiff's complaints.  Stutz told plaintiff that he would keep track of and document every incident that occurred from then on.  Following this meeting, Stutz emailed plaintiff a summary of their discussions.  Stutz's email indicated that plaintiff claimed the "bullying" to be "limited;" plaintiff responded that the incidents "have been much more than occasional."  Stutz testified that he did not believe that plaintiff's allegations related to Tilum constituted bullying or harassment.

On June 2, plaintiff reported to Stutz that Tilum had been in "our area" the previous day and that she was smirking and grinning.  On June 14, McKinney reported to Stutz that Tilum had passed her smiling and grinning.  Stutz documented the June 2 complaint but did not report either complaint to Human Resources or management because he did not believe it was necessary and he did not believe that the nonverbal communications amounted to bullying.  Plaintiff recorded each of these incidents in her desk blotter.[4]

Karwick testified that she deferred to Stutz all investigations into plaintiff's allegations and also relied on his conclusions.  Wanda Sheldon, Assistant Human Resources Administrator, testified that it would not have been unusual for Karwick to

---

[4]      Copies of the desk blotter were not produced in the course of discovery.

defer to Stutz with the investigation.

Following the filing of the CHRO complaint on June 2, 2006, and in response to the file cabinet incident, the Affirmative Action Office conducted an investigation into the incident, as well as allegations related to (1) Jolly's statement that plaintiff would not get a promotion; (2) Jolly's failure to give her a performance appraisal for 2005; and (3) the assignment of Stutz to her projects.  The investigation was initiated by Renee LaBarge, Equal Opportunity Specialist in the Office of Equal Employment Diversity.

During LaBarge's interview, she asked plaintiff about harassment by Tilum following the Chapman lawsuit.  According to LaBarge, plaintiff could only recall one instance of glaring and snickering by Tilum because of the Chapman lawsuit; LaBarge did not consider it an ongoing problem.  Nor did LaBarge believe that Tilum's behavior amounted to discrimination based on race.

## VI.    July 7 Incident

On July 7, 2006, plaintiff testified that, while she was using the paper cutter, Tilum swung her hands holding papers over her head, almost hitting plaintiff on the head.  Tilum testified that she was collecting a fax from the fax machine that she was assigned to use.  Sanders summarized the incident in a memorandum to the file and referred the matter to Karwick and Seldon, as well as Diane Donato, Director, Equal Opportunity and Diversity.  When McKinney reported the incident to Sanders, Sanders allegedly responded, "I do not want you disrupting this office."  Seldon testified that plaintiff's screaming during the incident was unusual.

Immediately after the incident, McKinney reported it to LaBarge who told plaintiff to put her report in writing so that LaBarge could inform her supervisors.  Because she

perceived the matter as one of workplace violence, LaBarge forwarded the complaint to Human Resources and did not investigate it as an affirmative action complaint.

On the morning of July 10, plaintiff emailed DOT Commissioner Steve Korta and copied Stutz, LaBarge and Robert Bissell.  In the email, plaintiff wrote, in pertinent part, "Since management is unable to stop this behavior from Ms. Tilum what I want to know from you is that if I address this situation off state property, will I be able to keep my job?"  Forwarding this message to Seldon, LaBarge suggested contacting the state police regarding plaintiff.  They decided not to.

Later that day, a threat assessment team of Arpin, Seldon, Karwick, Sanders, Director of Safety James Ritter and Director of Security Mike Morrison was convened to investigate whether Tilum posed a threat to plaintiff.  Sanders was not a regular member of the team, but he attended the meeting because the matter involved his subordinates; plaintiff testified that she was told that he attended as a witness for Tilum. Sanders had concluded that there were no imminent threats of violence.

The team determined that the parties were naturally separated and that there was no need for further action to keep plaintiff and Tilum separated.  Arpin's notes indicated that a fact-finding panel would be convened to determine if any inappropriate conduct occurred during the fax machine incident.

In an email to Korta, plaintiff mentioned that Dennis King had been the subject of workplace violence and harassment.  Plaintiff also stated that King and another coworker, Mr. Gambardella, had seen plaintiff "extremely distraught" and that they had given her bus money.  Having received this email, King emailed Korta that he was unaware of plaintiff's mental state that day.  He simply gave plaintiff change for the bus,

an occurrence which was not unusual.  King and Jolly then met with Sanders to share their concern that plaintiff had expressed an intention to be physically violent with Tilum in the email.  Sanders then contacted the threat assessment team to either reconvene or get clarification from plaintiff as to her intent expressed in the email.  In a second email, Sanders questioned whether plaintiff meant taking legal action or resorting to physical violence.  On July 10, Arpin, Seldon, Sanders, Ritter, Morrison and Employee Assistance Program Coordinator Lloyd Champagne met.  Karwick was instructed to obtain clarification of McKinney's email.

On July 12, Gerald Jennings, an African American male, and Brenda Janotta, a white female, met as the fact-finding panel of the July 6 incident.  Jennings and Janotta were selected by Seldon, in consultation with Karwick, because of their racial and gender identities.  The panel determined that there was no evidence that Tilum attempted to assault McKinney and that the alleged assault could not have occurred in the manner in which McKinney complained.  No disciplinary measures against Tilum were recommended.

**VII.    Escalation of Emails**

On July 13, McKinney emailed her union representative and copied Karwick, requesting "immediately and urgently" any memoranda or policy that "stipulates that I will lose my job if I handle the situations off state property."  Karwick responded to McKinney, asking what plaintiff meant by her statement "if I handle the situation off state property."  Plaintiff forwarded Karwick's email to her union representative, writing, "Specifically if I were to go to Lisa Tilum off state property and confront her verbally or physically?  Can I still keep my job at the CDOT?  I'm sick of Kathleen's bullshit attitude

13

and the nonsense.  No one can stop Lisa, but I can." LaBarge received these emails by blind-copy and reported these emails to her supervisors out of concern for violence.

The threat assessment team met on July 14 and included Arpin, Ritter, Special Investigator Bob Bissell, Sanders, LaBarge, Donato, Karwick and Seldon.  According to Arpin's notes, the team determined that there could have been a threat of imminent harm to Tilum by plaintiff based on the emails.  Arpin's notes further indicate that Sanders notified Tilum of the emails and that the state police were contacted because of the possible threat of harm.

Plaintiff was placed on administrative leave with pay on July 14 pending the investigation.

The state police conducted an investigation and applied for an arrest warrant for McKinney on charges of harassment in the second degree.  McKinney was arrested on July 25.

On July 19, Arpin wrote to McKinney requesting information on her allegations of ongoing workplace violence so that Arpin could commence an investigation.  McKinney did not respond to Arpin's request, because, she asserts, she was placed on leave shortly after the request was made and did not have sufficient time to respond.  Arpin informed plaintiff that she would forward a copy of plaintiff's email to the Commissioner to the Office of Equal Opportunity and Diversity for an investigation.  On July 24, Donato, as Director of that office, sent a letter to McKinney stating that her allegations were already under investigation in response to McKinney's complaint filed on June 12.

A fact-finding panel including Richard Allen, a white man, Debra Gross, an African American woman, and Kate Trudeau, a white female, was held on August 17.  It

14

determined that McKinney's emails violated the workplace violence policy and that her use of her office computer in a previous unrelated incident violated DOT and DAS's policies related to computer usage.  On September 5, the panel issued its recommendation of a five-day suspension for the inappropriate use of state property and a thirty-day suspension and transfer to another DOT facility for violation of the workplace violence policy.

## VIII.   Plaintiff's Termination

On October 11, a Loudermill hearing was conducted by Karwick and Jolly to allow plaintiff to present any mitigating factors for the disciplinary action proposed by Arpin.  McKinney presented, as mitigating factors, her lack of an intent to assault Tilum physically, her expressed desire only to talk with Tilum and her lack of a disciplinary history.  Jolly and Karwick found that McKinney had failed to present any information that mitigated the implication of the escalated and aggressive behavior towards Tilum.

Because Seldon was a witness to the fact-finding panel, the final decision on McKinney rested with Arpin.  Although she accepted the conclusions of the panel, Arpin did not agree with the level of penalty of the panel.  Further, Arpin disagreed with transferring McKinney because, she believed, such penalty was not permitted as discipline under McKinney's contract.  Therefore, Arpin recommended that plaintiff be terminated.  Arpin's conclusion was based on the specific nature of the threats, its escalation after the attempt at clarification, its indication as a planned act and Tilum's fear of plaintiff.  Arpin was also concerned with McKinney's swearing in the email.  Arpin was aware of the mitigating factors present in plaintiff's case.  Specifically, plaintiff did

not have a history of discipline and had apologized for the emails.  Further, plaintiff had stated that she did not intend to harm Tilum.  Despite this, Arpin believed that plaintiff's conduct was so egregious as to not merit progressive discipline.  Arpin did not speak to Tilum, Jolly or Sanders about her decision prior to the decision being made.

McKinney filed a grievance regarding her termination.  On December 29, 2008, after defendants filed their motion for summary judgment, an arbitrator determined that McKinney's termination was arbitrary.  The DOT was ordered to reinstate McKinney and provide backpay minus thirty-five days of suspension without pay, as was the fact-finding panel's recommendation.  Plaintiff chose to return to her previous position.

## IX.    Work Environment

Plaintiff testified that Tilum's motivation for yelling at her during the December 5, 2005 file cabinet incident was Tilum's targeting of all minorities in the Public Transportation Unit as well as plaintiff's friendship with Martires.  Plaintiff's belief stems from Tilum's "established pattern of going after all of the minorities in public transportation at that time."  In addition, McKinney asserted that Tilum retaliated against her because plaintiff planned to file suit against her for the December 2005 events.

McKinney further testified that Tilum harassed and bullied her in March 2006 in retaliation for McKinney telling other employees and Karwick that she was going to sue Tilum after the file cabinet incident.  McKinney further stated that Tilum knew that she would file suit as she had previously done against Brian Chapman.  Tilum, according to plaintiff, started smirking, harassing, intimidating and bullying plaintiff right before she lost her suit against Chapman, with the harassment reaching its peak in the fax

16

machine incident.

McKinney testified that "all of the minorities [in the Unit] have reported a problem with Lisa Tilum."  Dennis King stated in an email that he had not been the subject of any workplace violence or harassment and asked that any statement made by plaintiff regarding him be disregarded.

As to Jolly, McKinney testified that he called plaintiff lazy, incompetent and "litigation-happy."  Plaintiff also alleges that Jolly talked to her in a condescending manner, repeatedly ignored her, slammed doors in her face and lied to her.  Finally, plaintiff testified that Jolly had a black painted duck on his desk which initially was a standing joke.  Plaintiff later perceived it as representing her and her lack of promotions.[5]  Plaintiff never shared her concerns about the duck with Jolly.

Plaintiff alleged that Sanders contributed to the hostile work environment by "set[ting] the tone for other workers ... to disregard me, to ignore me as a viable co-worker..., to malign my work, my work product, to make my opinions and my contributions seem ... minimal at best."  McKinney surmised that this behavior was based on her race because, she claims, Sanders "hates black people."  She also claims that Sanders told her that "maybe you should be around your own kind so you won't be so bitchy."

Plaintiff alleges that Karwick contributed to the hostile work environment because she was "useless" and failed to investigate "every single incident that went on."  Karwick also, according to plaintiff, failed to perform her tasks as plaintiff's personnel officer and

---

[5]     The duck was given to Jolly in 1995 or 1996 as a Christmas present because Jolly would often say "if it walks like a duck, quacks like a duck, it's a duck."

by recommending, along with Jolly, plaintiff's termination.

Plaintiff testified that all minorities in the Bureau of Public Transportation made complaints of discrimination, including herself, Martires, King and others.  A review of the human resource and affirmative action files indicates no complaints filed by King or Yolanda Rivera, a Hispanic female, during their employment.  On April 7, 2005, the CHRO issued a finding of no reasonable cause as to James Peay's complaint of discrimination.  A review of the personnel files of Diane Connolly, Peay, Corinne Johnson, Linda Brainard and Yolanda Rivera does not indicate termination of these employees.

Despite plaintiff's allegations, neither Abigail Rivera nor King has received any discipline.  Martires received a one-day suspension for conduct based on a complaint by Cheryl Christian, an African American female.

## X.   Comparators

Plaintiff asserts that the differing treatment of comparators establishes an inference of discrimination.[6]  To provide the factual background for these comparators, plaintiff points to the affidavit of Seldon.  While providing the incidents by which plaintiff seeks to compare herself, Seldon's affidavit does not contain any information about the racial identities of any of the potential comparators.  Neither do the incident reports or other support materials.

---

[6]     The asserted comparators are Tom Thomches, David Astarita, Vincent Giardina, Raymond Carson, Stephen Davis, Francis Dudley, Michael Eason, Harold Emond, Daniel Espositio, Robert Grey, Joseph DeCosta, Lorenzo Hogan, Steven Puzzo, Linda Thomas, Gary Young, Bennett Zinkerman, David Deprodocini, Timothy Kelly and James Huntington.

**DISCUSSION**

A motion for summary judgment must be granted if the pleadings, discovery

materials before the court and any affidavits show that there is no genuine issue as to

any material fact and it is clear that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a

reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to

demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l

Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential

element of his case with respect to which he has the burden of proof, then summary

judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion

for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence

of a scintilla of evidence in support of the nonmoving party's position is insufficient;

there must be evidence on which the jury could reasonably find for him.  See Dawson v.

County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all

permissible factual inferences in favor of the nonmoving party.  See Patterson v.

County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the

record from which a reasonable inference could be drawn in favor of the opposing party

on the issue on which summary judgment is sought, summary judgment is improper.

19

See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**I.      Claims Against Individual Defendants in Their Official Capacities**

Defendants move for summary judgment on plaintiff's claims against the individual defendants in their official capacities and argue that such claims are barred by the Eleventh Amendment.  Upon review of plaintiff's Corrected Second Amended Complaint, the Court does not read any of plaintiff's claims as against any individual defendant in his or her official capacity.  Therefore, plaintiff's claims against the individual defendants do not run afoul of the Eleventh Amendment.

**II.     Jurisdiction Over Defendant Karwick**

Defendants next move for summary judgment on behalf of defendant Karwick, claiming that she was never properly served and the Court lacks personal jurisdiction over her.  Plaintiff does not dispute that service was never perfected.  Rather, she argues that she made a good faith effort to serve Karwick and urges the Court to find such effort sufficient.  She also argues that Karwick waived this objection to personal service through only general denials of personal jurisdiction and through Karwick's participation in the discovery process.

Plaintiff was provided with Karwick's home address during her deposition.  In addition, plaintiff is presumed to know Karwick's office address, and, in fact, served several of the individual defendants at their office.  Plaintiff has filed two exhibits regarding the failure to serve process.  The first is an affidavit by Marshal Lonnie Barnes stating that he attempted to serve Karwick at her home "several times."  Each

attempt, he stated, "failed as there was never anyone at home."  Plaintiff also included

an email from defendants' counsel to plaintiff's counsel dated August 18, 2008, stating

that the "[A]ttorney General's office does not accept personal service for anyone who is

sued in his or her personal capacity."

Karwick was named as a defendant in plaintiff's first amended complaint (Doc.

#27).  In their answer (Doc. #28), defendants listed as the tenth affirmative defense that

"[t]he Court lacks personal jurisdiction over some or all of the defendants."  After plaintiff

filed a second amended complaint (Doc. #62), defendants asserted in the answer that

"the Court lacks personal jurisdiction over defendants Kathleen Karwick and Vicki Arpin

for failure to perfect service" as the eighth affirmative defense.  Karwick has not

attended the depositions of any other defendant, and her involvement in discovery was

limited to her deposition and her responses to discovery.

The Federal Rules of Civil Procedure provide that service of a complaint must be

complete within 120 days after the complaint is filed; for good cause, the court can

extend the time to do so.  Fed. R. Civ. P. 4(m).  Rule 4(e) provides that service may be

accomplished(1) by whatever means provided by applicable state law or (2) by

delivering a copy of the summons to the individual personally, leaving a copy at the

individual's dwelling with a person of "suitable age" or delivering a copy to an authorized

agent.  Fed. R. Civ. P. 4(e).  Connecticut law provides that service may be effected by

leaving a copy of the summons with the defendant or at her usual place of abode.

Conn. Gen. State. § 52-57(a).  For individuals sued in their official capacity, service may

be made by leaving a copy of the process with the Attorney General's Office or by

sending a copy by certified mail to that office.  Conn. Gen. Stat. § 52-64.

21

The commentary to Federal Rule of Civil Procedure 4 indicates that "[i]f later conduct by the defendant is found inconsistent with preservation of the jurisdictional objection, the court may hold that the defendant waived it."  Fed. R. Civ. P. 4 cmt. C4-43 (1993); Brescia v. Leff, 2006 U.S. Dist. LEXIS 81384, *8 (D. Conn. Nov. 6, 2006).  In Brescia, the Court found that certain defendants' participation in depositions without raising objections regarding personal jurisdiction, combined with their failure to respond to plaintiff's waiver argument meant the defense had been waived.  The Court did note that "defendants' participation in depositions without reasserting their jurisdiction defense is relatively weak support for plaintiff's contention that subsequent conduct has waived the defense asserted in their answer."  Id. at *9.

Here, Karwick asserted improper service in her answer, the first opportunity to do so.  The Court was not provided with a full copy of her deposition and cannot determine whether Karwick asserted this defense during it.  Regardless, she did not claim that she had done so in her motion.

Plaintiff has not shown good cause for her failure to serve Karwick.  Further, her efforts to serve Karwick through the Attorney General's office are belied by the fact that Conn. Gen. Stat. § 52-64 applies only to suits against state government employees brought in their official capacities.  Banerjee v. Roberts, 641 F. Supp. 1093, 1099 (D. Conn. 1986) (observing that service through the Connecticut Attorney General was sufficient only as to defendants sued in their official capacities).  Plaintiff's operative complaint is clear that the action against Karwick, as well as the other defendants, is made in her individual capacity.  Finally, the fact that Karwick may have had notice of these proceedings is insufficient to establish jurisdiction over her.  See Ward v. State

22

Dep't of Pub. Safety, 2009 U.S. Dist. LEXIS 3756, *12-13 (D. Conn. Jan. 21, 2009).  In

light of plaintiff's failure to properly serve Karwick since the time that she filed her

answer, the Court will grant summary judgment in favor of Karwick.  See Bogle-Assegai

v. Connecticut, 470 F.3d 498, 508-09 (2d Cir. 2006).

**III.   Claims Under Section 1983 Against the DOT**

Defendants move for summary judgment on plaintiff's claim under 42 U.S.C. §

1983 against the DOT, contending that the Eleventh Amendment to the Constitution

bars suits for damages against state agencies.  Plaintiff argues that the DOT consented

to this suit by counsel's having appeared on behalf of the DOT and defending the action

on the merits.

Counts One and Two of the amended complaint are directed against the DOT for

violations of Title VII.  Similarly, Count Three, while addressing the conduct of Tilum,

Sanders and Jolly, is directed to the conduct of "the defendant," the title by which

plaintiff refers in the complaint to the DOT.  When addressing the individual defendants,

plaintiff refers to them as "the co-defendants."[7]  Count Three, then, is a claim under

sections 1981 and 1983 against the DOT.  The Court reads Count Four similarly.

Although discussing the conduct of Karwick and Arpin, it is ostensibly a claim against

---

[7]     The operative paragraph of Count Three states:

> The discriminatory acts of the co-defendants as aforedescribed were done in their individual capacities in violation of 42 U.S.C. Section 1981, and therefore, the defendant is liable to the plaintiff pursuant to 42 U.S.C. § 1983 of the Civil Rights Act of 1991, as amended.

Corrected Second Amended Complaint, ¶ 28.

the DOT for wrongful termination in violation of Title VII.[8]  Count Five is a claim under section 1983 against the DOT.  Count Six is a claim for wrongful termination in violation of the anti-retaliation provision of Title VII; it is not directed at any particular defendant. Count Seven and Eight are, respectively, claims for intentional infliction of emotional distress and negligence directed against the DOT.

Section 1983 authorizes suit only against a "person" who has deprived another of federal statutory or constitutional rights under color of state law.  42 U.S.C. § 1983. A state is not a "person" under section 1983.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  In addition, it is well-settled that a state agency is not a "person" within the meaning of section 1983.  See Clissuras v. City Univ. of N.Y., 359 F.3d 79, 81 (2d Cir. 2004) (finding that City University of New York was "arm of the state" and thus immune from liability under section 1983); Komlosi v. New York State Office of Mental Retardation & Developmental Disabilities, 64 F.3d 810, 815 (2d Cir. 1995) (holding state agency cannot be sued under section 1983).  Because the DOT is an arm of the State of Connecticut, it is not a "person" within the meaning of section 1983,

---

[8]     The operative paragraph of Count Four reads:

The defendant's failure, through its agents, servants and/or employees, to adhere to its own anti-bullying policy, whereby plaintiff should have been permitted to not only ask hypothetical questions about her options regarding Tilum's intimidating conduct, but also to confront her.  Instead, plaintiff was wrongfully discharged due to the discriminatory, harassive, improper and illegal actions of the defendant, through its agents, servants and/or employees in violation of Title VII and 42 U.S.C. § 1981.

Corrected Second Amended Complaint, ¶ 39.

and plaintiff cannot assert claims against the DOT pursuant to section 1983.

In Count Three, plaintiff complains about the individual defendants' conduct, but ascribes it to the DOT under an agency theory.  Therefore, the DOT is the tortfeasor under that count, not Tilum, Sanders or Jolly.  As a claim against a state agency under section 1983, it cannot stand.  Summary judgment will be granted as to the claims under section 1983 of Counts Three and Five.

Even if the Court were to read plaintiff's claims under section 1983 as asserted against the individual defendants, summary judgment would still be appropriate.  To establish liability under section 1983, plaintiff must demonstrate (1) that the conduct in question deprived her of a right, privilege, or immunity secured by the laws of the United States, and (2) that the acts were attributable at least in part to defendants acting under color of state law.  Garcia v. Brown, 268 Fed. Appx. 127, 129 (2d Cir. 2008).  An employee is deprived of her right to be free of discrimination when she is treated differently from similarly situated employees on account of her race.  See Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (addressing race); Russell v. Hughes, 2009 U.S. Dist. LEXIS 37070, *5-6 (D. Conn. Apr. 30, 2009).  To succeed on her claim, plaintiff must demonstrate (1) that she was treated differently from similarly situated individuals (2) because of her race.  Harlen, 273 F.3d at 499.

For employees to be similarly situated, they must be similarly situated "in all material respects."  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  In such a case, the circumstances of the plaintiff and the individuals need not be identical, but there should be a reasonably close resemblance of facts and circumstances.  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); see also

25

McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").  The court should determine whether plaintiff and the asserted comparators are similar in significant respects by considering whether the respective individuals had the same supervisors, were subject to the same performance evaluation and disciplinary standards, and engaged in conduct of comparable seriousness without any differentiating circumstances.  Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); Graham, 230 F.3d at 40 ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."); Shumway, 118 F.3d at 64.  To determine whether two acts are of comparable seriousness requires the Court to examine "the context and surrounding circumstances in which those acts are evaluated."  Graham, 230 F.3d at 40.  Ultimately, whether two employees are similarly situated is a question of fact.  Id. at 43.  "[T]his rule is not absolute ... and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  Harlen Assocs., 273 F.3d at 499 n.2.

Because there is no evidence before the Court regarding the racial identities of any of the comparators, there is no evidence for a reasonable jury to conclude that plaintiff was treated differently from similarly situated individuals.  Summary judgment is therefore appropriate on plaintiff's section 1983 claims.

26

## IV.    Claims Under Section 1981

Defendants move for summary judgment on plaintiff's claims under section 1981.

Counts Three and Five state claims under sections 1981 and 1983.  As the Supreme

Court has ruled, a claim against a state actor for violating rights guaranteed by section

1981 must be brought under section 1983.  See Jett v. Dallas Sch. Dist., 491 U.S. 701,

735 (1989); see also Anderson v. Conboy, 156 F.3d 167, 176 n.17 (2d Cir. 1998)

(following Jett despite circuit split over whether opinion survives enactment of section

1981(c)).  Despite the current circuit split, the Court believes that Jett controls and

precludes a claim under section 1981 for discrimination against state actors.  See

Jain v. Univ. of Conn., 2009 U.S. Dist. LEXIS 4272, *4 (D. Conn. Jan. 22, 2009); Vaden

v. Connecticut, 557 F. Supp. 2d 279, 291-92 (D. Conn. 2008).  Plaintiff's claims under

section 1981 will be dismissed.  In light of the Court's previous dismissal of the claims

under section 1983 against the DOT, no elements of Counts Three and Five remain

and those Counts will be dismissed in their entireties.

## V.    Title VII Claims Against Individual Defendants

As discussed earlier, the Court reads Count One, Two and Four of plaintiff's

Corrected Second Amended Complaint as against the DOT for a violation of Title VII

and 42 U.S.C. § 1981.  Defendants read Counts One and Two as possibly brought

against certain of the individual defendants.  Although the Court does not read the

complaint in this manner, the Court will dismiss any claims under Title VII brought

against any of the individual defendants.  See Tomka v. Seiler Corp., 66 F.3d 1295,

1317 (2d Cir. 1995) ("[A]n employer's agent may not be held individually liable under

27

Title VII.").  Despite plaintiff's invitation to do so, the Court will decline to ignore the relevant controlling precedent.

Count Six of the complaint is for retaliation in violation of Title VII.  Absent more specific allegations, the Court construes this claim as asserted against DOT, so as to preserve it under <u>Tomka</u>.

## VI.   Title VII Claims Against DOT

Counts One, Two, Four and Six are styled as claims under Title VII for hostile work environment based on plaintiff's race (Count One), hostile work environment based on plaintiff's participation in activities protected by Title VII (Count Two) and wrongful termination in violation of Title VII based on plaintiff's race (Count Four) and her participation in activities protected by Title VII (Count Six).  The Court reads Count One as asserting a claim for discrimination under Title VII.  The Court will address each count in turn.

### A.   Title VII Discrimination Claim

Title VII prohibits an employer from treating an individual less favorably on account of her gender, race, color or national origin.  42 U.S.C. §  2000e-2; <u>Feingold v. New York</u>, 366 F.3d 138, 150 (2d Cir. 2004).  Where there is no direct evidence of discrimination, a Title VII claim is analyzed under the shifting burdens described in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973).  Plaintiff must first establish a prima facie case of discrimination.  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981).  Defendant must then articulate a legitimate, non-discriminatory reason for taking the actions that establish the prima facie case.

The reason provided must be both "clear and specific."  Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985).  If defendant satisfies this requirement, plaintiff must show that defendant's proffered reason is a pretext for discrimination.  Plaintiff is not required to prove that the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision, but only that those were not the only reasons and that plaintiff's protected status contributed to the employer's decision.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001).  At all times, plaintiff bears the burden of persuading the trier of fact that defendant intentionally discriminated against her.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

A prima facie case under Title VII requires that plaintiff show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004).  At this stage, plaintiff's burden is minimal.  Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997).

If plaintiff establishes a prima facie case, the burden of production turns to defendants to establish a legitimate, non-discriminatory reason for terminating or otherwise subjecting plaintiff to a hostile work environment.  Plaintiff must then prove by a preponderance of the evidence that the supposed-legitimate reason is actually a pretext for discrimination.  St. Mary's Honor Ctr., 509 U.S. at 515.

Plaintiff seeks to draw an inference of discrimination by comparing her situation with similarly-situated individuals outside the protected class who were treated

29

differently.  The governing law to establish an inference of discrimination in the Title VII context is the same as in the section 1983 context described above.

Plaintiff has demonstrated that she is a member of a class protected under Title VII.  Both parties agree that plaintiff's termination would qualify as an adverse employment action.  At this time, however, she is no longer terminated, but was reinstated to her position by an arbitrator's ruling.  The Court will assume, for the purposes of this ruling, that plaintiff's termination-and-reinstatement qualify as an adverse employment action for purposes of demonstrating discrimination under Title VII.  Where there is an absence of direct evidence to support an inference of discrimination, plaintiff may establish such connection through the use of comparators – other employees who are similarly-situated employees outside the protected class who were not terminated despite committing offenses similar to what plaintiffs committed.

Whether there is sufficient evidence for a reasonable jury to conclude that there is an inference of discrimination that plaintiff was terminated in violation of Title VII turns on the similarities between plaintiff and the offered comparators.  As noted above, however, while plaintiff attempts to provide comparators, there is no information before the Court to evidence these potential comparators' racial identities.  Without such evidence, there can be no inference of discrimination.  See Goldman v. Admin. for Children's Servs., 2007 U.S. Dist. LEXIS 39102, *26-27 (S.D.N.Y. May 28, 2007) (granting summary judgment where plaintiff failed to provide evidence of comparators' racial backgrounds or national origins); see also Shumway, 118 F.3d at 65 (affirming summary judgment where plaintiff's evidence of comparators was limited to "sweeping

allegations" of similarities).  Therefore, summary judgment is appropriate on plaintiff's Title VII discrimination claim under Count One.

**B.      Hostile Work Environment Claim under Title VII**

Plaintiff alleges in Count Two that defendant DOT subjected her to a hostile work environment because she undertook activities protected by Title VII.  A hostile work environment exists in violation of Title VII where the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  To prevail on a hostile work environment claim, the plaintiff must show both (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive so as to alter the conditions of her employment and (2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment.  Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996).  Relevant factors include: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at 23.

"The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility."  Leibovitz v. New York City Transit Authority, 252 F.3d 179, 188 (2d Cir. 2001).  Isolated remarks or occasional episodes of harassment will not merit relief

31

under Title VII; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.  Garvin v. Potter, 367 F. Supp. 2d 548, 568 (S.D.N.Y. 2005); see also Payami v. City of New York, 2007 U.S. Dist. LEXIS 25851 (S.D.N.Y. Mar. 28, 2007) (granting defendants' motion for summary judgment because plaintiff's claims of race-based harassment did not rise to the level of a hostile work environment where he merely alleged "hostile and insulting remarks based upon his race").

A plaintiff claiming racially motivated hostility under Title VII must demonstrate that the conduct took place because of her race.  See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (holding that it is "axiomatic" that plaintiff's claim of a hostile work environment based on her sex must show conduct took place because of her sex); Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989) (conduct complained of must have been prompted by victim's status).

In this case, plaintiff claims that she suffered from a hostile work environment as evidenced by the following episodes:

- Sanders telling plaintiff in front of the entire office, in response to the July 7 fax machine incident, "I do not want you disrupting this office, which plaintiff contends, undermined her authority and respect within the office;

- Jolly's statement that plaintiff had "no chance in hell" of receiving a promotion;

- The service ratings received from Jolly in 2003 and 2004;

- Sanders' statement to plaintiff that "maybe you should be around your own kind so you won't be so bitchy;

- •   Sanders' failure to treat the fax machine incident as presenting an imminent danger to plaintiff;

- •   The allegedly-inadequate handling of plaintiff's complaint of "bullying" by Tilum;

- •   Tilum's behavior towards plaintiff.

Plaintiff further argues that these incidents and her treatment in response were caused by her race.

      With the one exception of Sanders's statement that plaintiff "should be around her own kind," none of these incidents show any sort of racial component.  Further, the "own kind" comment does not present a sufficient connection to plaintiff's race to defeat summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 43 (2d Cir. 2000) (finding that references to plaintiff as "nice" or "nurturing," if made, were not directed to her gender).  Even if it did, a one-time comment like this one is insufficient for finding a hostile workplace.  See Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999).

      Lastly, a reasonable jury could not conclude that the other activities either rise to the requisite level under Liebovitz or are related to plaintiff's race under Alfano. Therefore, plaintiff's Title VII hostile work environment claim will be dismissed.

      Because the Court finds that plaintiff cannot establish a claim of hostile work environment, the Court will not address the parties' arguments concerning the application of the three-year statute of limitations to plaintiff's claims.

**C.    Retaliation under Title VII**

      Counts Four and Six of the Corrected Second Amended Complaint allege, respectively, that plaintiff was terminated based on her race and based on her

participation in activities protected by Title VII.

For the reasons expressed in Section VI.A. above, summary judgment is appropriate on Count Four.

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful practice by this subchapter...."  42 U.S.C. § 2000e-3(a).  A Title VII prima facie case of retaliation requires plaintiff to show: (1) that she engaged in protected activity; (2) that the employer was aware of the activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action.  Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004).  Once plaintiff has established a prima facie case, the burden-shifting paradigm of McDonnell-Douglas applies.

In the context of a retaliation claim, an employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Rail Co. v. White, 548 U.S. 53, 68 (2006).  As the Court in Burlington explained, a court considering material adversity should separate significant from trivial harms.  The Court of Appeals has instructed that oral and written warnings do not generally amount to materially adverse conduct.  Chang v. Safe Horizons, 254 Fed. Appx. 838, 839 (2d Cir. 2007).  The application of the employer's disciplinary policies does not, without more, constitute an adverse employment action.  Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006).  An arrest can also constitute an adverse employment action insofar as it could dissuade an employee

34

from making or supporting a charge of discrimination.  Argyropoulos v. City of Alton, 539 F.3d 724, 733 (7th Cir. 2008).

The causal connection between a protected activity and an adverse employment action may be established by direct evidence or by showing the protected activity was closely followed in time by the adverse action.  Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001). Generally, courts have found that a time period of one year between the protected activity and the alleged retaliatory act is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.  See Chang, 254 Fed. Appx. at 840 (no causal nexus based on temporal proximity where alleged retaliation occurred almost one year following protected activity); Deravin v. Kerik, 2007 U.S. Dist. LEXIS 24696, *39-40 (S.D.N.Y. Apr. 2, 2007) (collecting cases).  Additionally, a plaintiff cannot rely on temporal proximity where "gradual adverse job actions" commenced prior to the protected activity.  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 85 (2d Cir. 2001).

Plaintiff contends that her protected activity consists of (1) her filing a lawsuit in 2001 regarding her failure to be promoted; and (2) her lodging a CHRO complaint on June 2, 2006 and of an EEOC complaint on June 12, 2006.  She equivocates on whether the filing of a lawsuit against Brian Chapman, which asserted claims for defamation, intentional infliction of emotion distress and negligent infliction of emotional distress, qualifies as a Title VII protected activity.  Considering this lawsuit was not directed to claims of racial discrimination, the Court concludes that the filing of it cannot constitute a protected activity under Title VII.

35

Defendants concede that plaintiff's termination in November 2006 would qualify as an adverse employment action.  They dispute that plaintiff's other complaints would meet this requirement.  The Court believes that the actions about which plaintiff complains, including the "bullying" by Tilum, cannot qualify as adverse employment actions based on the June 2006 filings for the simple reason that they occurred before plaintiff filed complaints with the CHRO and the EEOC.  In addition, Tilum's actions occurred before and after plaintiff filed her CHRO complaint; therefore, a reasonable jury could not conclude that Tilum's "bullying" was due to the filing of the CHRO complaint.  That leaves only the July 7 incident and the subsequent investigation and termination of plaintiff as the only potential adverse employment actions.

With plaintiff being able to establish a prima facie case of retaliation for having filed a CHRO and an EEOC complaint, the burden turns to defendants to articulate legitimate, non-discriminatory reasons for taking the adverse actions against plaintiff. The Court finds defendants' response to the threatening email and plaintiff's subsequent responses to be legitimate reasons for defendants' reaction.

While plaintiff attempts to demonstrate that she was treated differently than certain similarly-situated comparators, the Court has no information on whether these comparators took actions protected by Title VII.  Without such evidence, plaintiff is unable to show that defendants' reason for her termination was pretextual.  Summary judgment is therefore appropriate on plaintiff's retaliation claim under Count Six.

None of the other actions claimed by plaintiff to be protected under Title VII are within the scope of the statute.  Even if plaintiff's 2001 lawsuit were considered an activity protected under Title VII, the time lag between its filing and the events at issue

36

in this case are too attenuated to raise an inference that plaintiff was retaliated against for that suit.

## VII.   Intentional Infliction of Emotional Distress

Defendants move for summary judgment on plaintiff's claim of intentional infliction of emotional distress against the DOT on the grounds that the State has not waived its sovereign immunity to be sued on this claim in federal court.  Plaintiff concedes that there has been no waiver.  Summary judgment is therefore appropriate on this count.

## VIII.   Negligent Supervision

Defendants move for summary judgment against plaintiff's claim of negligent supervision against the DOT on the grounds that it is barred by sovereign immunity. The Court will not rely upon this argument.  Instead, as noted by defendants, Connecticut law provides that there can be no claim for negligence in the context of a continuing employment relationship.  See Grunberg v. Quest Diagnostics, Inc., 2008 U.S. Dist. LEXIS 8205, *27-26 (D. Conn. Feb. 5, 2008) (granting summary judgment on negligent supervision claim; citing cases); Perodeau v. City of Hartford, 259 Conn. 729, 758-63 (2002).  Therefore, summary judgment is appropriate on plaintiff's negligent supervision claim against the DOT.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion for summary

judgment on all counts.  The Clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this 2d day of December, 2009.


_____/s/_____
Warren W. Eginton
Senior United States District Judge